# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**VEVIE JENNINE GRAHAM,** *et al.*,

      **Plaintiffs,**

                                       **Case No.: 08-CV-120**

**v.**                                          **JUDGE SMITH**

                                          **Magistrate Judge Kemp**

**MANLEY DEAS KOCHALSKI LLC,** *et al.*,

      **Defendants.**

## OPINION AND ORDER

Plaintiff Vevie Jennine Graham ("Graham") brings this action against Defendants Manley Deas Kochalski LLC ("Manley Deas"), Kevin L. Williams ("Williams"), and Washington Mutual Bank ("Washington Mutual") (collectively "Defendants") under the Federal Debt Collection Practices Act ("FDCPA"). Graham is also asserting claims for violation of the Ohio Consumer Sales Practices Act ("OCSPA") and malicious prosecution.

Defendants filed a joint Motion for Judgment on the Pleadings on July 16, 2008, contending this Court lacks subject-matter jurisdiction over Graham's FDCPA claim and, therefore, lacks supplemental jurisdiction over Graham's state law claims (Doc. 15). Alternatively, Defendants contend that all of Graham's claims for relief fail as a matter of law.

Thereafter, a discovery controversy arose among the parties, which resulted in Graham's filing a Motion to Compel Discovery (Doc. 22). On October 16, 2008, Magistrate Judge Kemp held a conference with the parties to address that motion, during which he ordered the parties to

defer all issues until the Court determines whether it has subject-matter jurisdiction[1] (Docs. 26

and 27). Pursuant to Magistrate Judge Kemp's Order, Graham filed a Memorandum in

Opposition to Defendants' Motion for Judgment on the Pleadings on January 9, 2009, addressing

only Defendants' argument regarding subject-matter jurisdiction (Doc. 36). Defendants' Motion

is now ripe for review. For the reasons that follow, this Court **DENIES** Defendants' Motion for

Judgment on the Pleadings (Doc. 15).

## I.     BACKGROUND

Plaintiff Graham's primary residence is located at 695 Island Court, Columbus, Ohio

("Island Court"). (Graham Depo. at 11). The home was originally secured by a mortgage in

1976 and has been refinanced a number of times since then. The two refinances at issue in this

case occurred in December 2005 and March 2006.

In early December 2005, Plaintiff refinanced an existing loan secured by Plaintiff's

personal residence at 695 Island Court. This loan was in the amount of $186,200 and had an

interest rate of 9.9%. This loan paid off the entirety of a prior loan from August 2005 with New

Century Mortgage, secured by the same property, in the amount of $168,250, that had an interest

rate of 6.950%. Plaintiff received $10,337.68 at closing, after deductions for closing costs, taxes

and the satisfaction of the prior mortgage. (Graham Depo. Ex. 7, December 2005 HUD

Statement; and Ex. 21, December 7, 2005 Adjustable Rate Note). Plaintiff deposited that money

---

[1] In *Walton v. Claybridge Homeowners Assoc. Inc. et al.*, 2009 U.S. Dist. LEXIS 21414 at *12, the Court noted that "whether an obligation qualifies as a "debt" under the FDCPA is better treated not as a question of subject matter jurisdiction but as an element of the claim." Regardless, the majority of the cases evaluate this issue as one of subject matter jurisdiction, therefore, the Court will do the same. *See Berman v. GC Services Ltd. Partnership*, 146 F.3d 482, 484 (7th Cir. 1998).

into an account she held jointly with her grandson at Fifth Third Bank (account ending in 3980).
Prior to this deposit, there was a balance of $100.04 in that account.  (Graham Depo. Ex. 8; Dec.
Fifth Third Account Statement).

Prior to the refinance, Graham became interested in purchasing investment properties and
consulted real estate agents regarding such properties. (Graham Depo. at 76-77).  On October 1,
2005, Graham discussed purchasing a house at 2178 Coalfax Avenue ("Coalfax Property") and
even made an offer to buy the property that same night. (Graham Depo. at 75-76).  On December
7, 2005, Plaintiff also decided to purchase a house on 2302 Palmetto Road ("Palmetto
Property").

On December 20, 2005, Plaintiff Graham closed on the Palmetto Property.  At the time of
the closing, she owed $3,135.87.  She obtained an official check in the amount of $3,077.30
from the Fifth Third Account and wrote a personal check for $58.57, for a total of $3,135.87.
(Graham Depo. at  50-51, 53).  On January 19, 2005, Graham closed on the Coalfax property, at
which time she owed $6,308.87.  She obtained an official check from her Fifth Third Account
for $5,700, which she later endorsed to Lakeside Title, and wrote a personal check from the Fifth
Third Account for $608.87, for a total of $6,308.87.  (Graham Depo. at 60-62).

On March 3, 2006, Plaintiff Graham refinanced the mortgage on her personal residence
again.  She obtained a first mortgage loan in the amount of $168,000 with an interest rate of
7.875% with American Conduit[2] (the "InterFirst loan").  Plaintiff still owed $188,187.05 on the
December 2005 loan secured by her personal residence.  In order to payoff the prior mortgage,

_____

[2] American Conduit assigned the mortgage and note to the Mortgage Electronic
Registration System.  Then, on June 1, 2006, the mortgage and note were purchased by and
assigned to Washington Mutual.

Plaintiff also took out a $42,000 second mortgage with an interest rate of 12.125%. (Graham Depo. Ex. 23 March 3, 2006 InterFirst Note; Graham Depo. Ex. 25, March 3, 2006 Balloon Note).

Plaintiff Graham used $147,547.55[3] from the InterFirst loan to pay the December 2005 loan it replaced. (Graham Depo. Ex. 16, March 3, 2006 InterFirst HUD Statement). She used the second mortgage to pay the remaining $40,639.50 balance on the same December 2005 loan. (Graham Depo. Ex. 28, Balloon Note HUD Statement). The closing costs for the first mortgage were $6,132.23 and $1,360.50 for the second mortgage. As cash-out proceeds, Graham received $14,320.22 from the InterFirst loan. (Graham Depo. Ex. 16, March 3, 2006 InterFirst HUD Statement). She applied $11,483[4] of these funds against the then-outstanding balance on her Fifth Third Account and received $2,837.22 in cash. (Graham Depo. Ex. 16, March 3, 2006 InterFirst HUD Statement).

Graham made payments on the InterFirst Note through February 2007, but failed to make the March 2007 payment. As a result, on July 20, 2007, Washington Mutual, through Manley Deas and Williams, filed a foreclosure action in this Court. (*See Washington Mutual Bank v. Jennine Graham, et al.*, S.D. Ohio Case No. 2:07-cv-699, Marbley, J.). The foreclosure complaint identified the debt it was attempting to collect as arising from a March 3, 2006 "InterFirst" promissory note, and a first mortgage secured that note as filed with the Franklin

---

[3] Plaintiff argues that she applied the entire amount of the $168,000 InterFirst loan to the previous December 2005 loan.

[4] Defendants argue that "[m]uch of the $11,483 credit card debt was likely commercial." (Defs' Reply at 5). Defendants assert that approximately $7000 in charges on the Fifth Third Account were for a truck purchased for her grandson to perform repairs on her investment properties.

County Recorder's Office as "Official Instrument Number 200603090044698." The complaint

further described the property as:

> Situated in the City of Columbus, County of Franklin and State of Ohio: Lot
> Number (80) of Thomas Lane Addition, as the same is numbered and delineated
> upon the recorded plat thereof, of record in Plat Book 27, page 46, Recorder's
> Office, Franklin County, Ohio.

(Foreclosure Compl. at 2-13). That property, also known as 695 Island Court, Columbus, Ohio,

has been Plaintiff's personal residence for 32 years.

On January 29, 2006, Graham and Washington jointly and voluntarily dismissed the

foreclosure action without prejudice. (Doc. 15-5). However, Graham continued to default on

her mortgage, so on June 13, 2008, Washington re-filed its foreclosure action in Franklin County

Court of Common Pleas. On February 7, 2008, Plaintiff filed this action, asserting violations of

the FDCPA and the OCSPA and malicious prosecution.


## II.    STANDARD OF REVIEW FOR JUDGMENT ON THE PLEADINGS

The standard for reviewing a motion for judgment on the pleadings under Fed. R. Civ. P.

12(c) is identical to the standard applied to a motion to dismiss for failure to state a claim under

Fed. R. Civ. P. 12(b)(6). *Mixon v. Ohio*, 193 F.3d 389, 399-400 (6th Cir. 1999). When

considering a motion to dismiss pursuant to Rule 12(b)(6), a court must construe the complaint

in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the

amended complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Roth Steel Prods.

v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). A Rule12(b)(6) motion to dismiss is

directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods.*, 705 F.2d at

155. The merits of the claims set forth in the complaint are not at issue on a 12(b)(6) motion to

dismiss.  Consequently, a complaint will be dismissed pursuant to Rule 12(b)(6) only if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief.  *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978).

Rule 12 (b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 296 (2d ed. 1990).  The moving party is entitled to relief only when the complaint fails to meet this liberal standard.  *Id.*

Although the court must apply a liberal construction of the complaint in favor of the party opposing the motion to dismiss, a court will not accept conclusions of law or unwarranted inferences of fact cast in the form of factual allegations.  *See Blackburn v. Fisk Univ.*, 443 F.2d 121, 124 (6th Cir. 1971); *see also Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007).[5]  A plaintiff's obligation to provide the "grounds" of his entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action.  *See LULAC v. Bredesen*, 2007 U.S. App. LEXIS 20556 at *3-4 (6th Cir. 2007) (*citing Bell Atlantic Corp. v. Twombly*, 127 S. Ct. at 1964-65).  The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they

---

[5] In this recent *Bell Atlantic Corp.* case, the United States Supreme Court rejected the language previously used by the Court in *Conley v. Gibson*, providing that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). *See Bell Atlantic Corp.*, 127 S.Ct. at 1964 (holding that the *Conley* "no set of facts" language "has earned its retirement" and "is best forgotten.").

must show entitlement to relief.  *Id.* at 1965.  To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory.  *Id.* at 1969.  A complaint must allege enough facts to state a claim to relief that is plausible on its face.  *Bell Atlantic*, 127 S.Ct. at 1974.

However, when a Defendant files a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the standard may change.  Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties: facial and factual. *Leader Technologies, Inc. v. Zacks*, 2008 WL 440423 at *3 (S.D. Ohio 2008).  A *facial* attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading.  *Ohio Nat. Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir. 1990).  In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss.  *Id.*  On the other hand, when a court reviews a complaint under a *factual* attack, no presumptive truthfulness applies to the factual allegations.  *Id.*  When facts presented to the district court give rise to a factual controversy, the district court must weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist.  *Id.*

### III.    DISCUSSION

Defendants Manley Deas, Williams and Washington Mutual have moved for judgment on the pleadings.  As a result of Magistrate Judge Kemp's prior order, the only issue before the Court is subject matter jurisdiction.  Defendants argue that this Court lacks subject matter jurisdiction over Plaintiff's FDCPA claims because they do not satisfy the statutory definition of debt.  Plaintiff, however, argues that Defendants' unlawful collection activity occurred in the

course of their attempt to collect amounts due under the "InterFirst" note, and the money associated with that note were used only in connection with Plaintiff's continuing use of her personal residence at 695 Island Court.

## A.    Plaintiff's Burden to Establish Subject Matter Jurisdiction

Defendants contend that this Court lacks subject matter jurisdiction because Graham's loan is not a "debt" as defined in the FDCPA. Defendants also assert that because this Court lacks jurisdiction over Graham's federal claim, it lacks supplemental jurisdiction over her state law claims.

When subject matter jurisdiction is challenged, the burden is on the plaintiff to demonstrate that it exists. *Kafele v. Javitch, Block, Eisen & Rathbone, LLP*, 2004 U.S. Dist. LEXIS 30276, at *4 (S.D. Ohio Sept. 28, 2004) (Holschuh, J.); *see also, Ogle v. Church of God*, 153 Fed. Appx. 371, 375 (6th Cir. 2005). In resolving motions to dismiss for lack of subject matter jurisdiction, courts may resolve factual disputes. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). "Where the defendant brings a factual attack on subject matter jurisdiction, no presumption of truth applied to the allegations in the pleadings, and the court may consider documentary evidence in conducting its review." *Ogle*, 153 Fed. Appx. at 375.

Jurisdiction under the FDCPA is dependent upon the transaction being a consumer debt. *Sherlock v. Herdelin*, No. 04-cv-3438, 2008 U.S. Dist. LEXIS 21794 at *10 (E.D. Pa. Mar. 17, 2008). If the FDCPA definition of debt is not satisfied, federal courts lack subject matter jurisdiction over the claims. *See Brown v. Saxon Mortgage Serv.*, 2005 WL 3244295 (S.D. Ohio Nov. 30, 2005) (dismissing FDCPA claim for lack of subject matter jurisdiction where plaintiff

could not establish that defendant was a "debt collector" as defined in the FDCPA).  Thus, a plaintiff invoking the FDCPA's protections has the burden of proving that the disputed transaction is a consumer credit transaction and not a business transaction.  *Id.*

**B.      Plaintiff's FDCPA Claim**

   *1.      Plaintiff's Arguments*

Plaintiff Graham's Complaint alleges that Defendants violated the FDCPA by using unfair and unconscionable collection practices, false or misleading representations, and harassing and abusive attempts to collect a mortgage loan debt through a previous foreclosure action.  The underlying action, *Washington Mutual Bank v. Jennine Graham, et al.*, case number C2-07-0699, was initiated to collect the debt Plaintiff incurred on the March 3, 2006 InterFirst promissory note and first mortgage securing that note.  The March 3, 2006 InterFirst note describes the obligation for Plaintiff to pay $168,000 to American Brokers Conduit with payment secured by the first lien on her home.  (*See* Uniform Residential Loan Application and Settlement Statement, both dated March 3, 2006).  Plaintiff asserts that the entirety of the $168,000 loan was used to pay the then-outstanding first mortgage loan of $187,473.89 owed a different lender from the December 2005 refinance.

Plaintiff asserts that the remaining $19,473.89 owed on the earlier mortgage was paid from the proceeds of a different $42,000 loan (a second mortgage), separately consummated by means of a different balloon note and subsidiary mortgage agreement.  (*See* Truth in Lending Disclosure Statement and Settlement Statement; subordinate mortgage and balloon note).  $11,483.26 of the remaining proceeds of this separate loan were paid to Fifth Third Bank to settle Ms. Graham's personal Mastercard account balance.

Plaintiff asserts that the March 3, 2006 Interfirst loan was a refinance of the prior mortgage on her personal residence, and therefore, the InterFirst loan's purpose was purely personal, and thus, satisfies the FDCPA's definition of "debt." (Pl.'s Response at 8). Plaintiff relies on *Slenk v. Transworld Sys.*, 236 F.3d 1072, 1075 (9th Cir. 2001), in support of her argument that the loan in question constitutes a debt under the FDCPA. The *Slenk* court held that "[t]here could not be a more quintessential personal, family, or household purpose" for debt than one incurred in connection with a family home." *See also Wilson v. Draper & Goldberg*, P.L.L.C., 443 F.3d 373, 376 (4th Cir. 2006) (attorneys seeking to foreclose on consumer's home were attempting to collect a debt subject to the FDCPA since property which was the subject of the mortgage loan transaction was primarily used for personal, family, or household purposes).

Plaintiff Graham argues that the proceeds of the second mortgage obtained along with the March 2006 loan, $11,483.26, should not even be considered. But even if it is considered and construed as used for commercial purposes as Defendants argue, that does not affect the loan's *primary* consumer purpose, because such commercial "taint" does not preclude the FDCPA's application. *See Semar v. Platte Valley Savings and Loan Assoc.,* 791, F.2d 699 (9th Cir. 1986) (Under TILA, a loan was a consumer transaction where 10% of the proceeds were used for a business purpose).

Additionally, Graham relies on case law holding that a transaction's purpose is determined as of the incipience of that obligation, not from what occurred before or after the transaction giving rise to the specific obligation at issue. *See Broadmax v. Greene Credit Service*, 1997 WL 14777 (6th Cir. 1977); *see also Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC*, 214 F.3d 872, 857 (7th Cir. 2000)(obligation's status as a "debt" under the

FDCPA must be determined as of the time the obligation arises). There can be no transaction under the statutory definition before the dealings that allegedly create the debt to which the disputed collection activity relates. Plaintiff asks if Defendants' test were the standard, and earlier transactions were consider, where would the test end? Should such loan transactions be traced back to their inception? The case law is clear that the totality of the circumstances of the March 3, 2006 loan may be examined to determine the consumer purpose of that transaction and accordingly, plaintiff asserts that such standard excludes the circumstances of any other or earlier transactions.

2.      *Defendants' arguments*

Defendants assert that refinancing a mortgage loan does not qualify as an FDCPA "debt" solely because the borrower's residence secures the property. Rather, Defendants contend that only the purpose of the loan is relevant in determining whether it is a "debt" under the FDCPA. Since the Interfirst loan provided a better interest rate[6] than the loan it refinanced (the December 2005 loan), Defendants suggest the Court should look to the purpose of the first loan to determine the purpose of the Interfirst loan. Then, because the December 2005 loan increased the interest rate on the mortgage from 6.95% to 9.9%, Defendants argue that the Court should only look to the purpose of the $10,337.68 cash-out proceeds from the December 2005 loan, which was used to purchase two investment properties. Defendants argue that based on Plaintiff's use of the $10,337.68, the December 2005 loan was for a commercial purpose. Further, Defendants argue that the March 2006 loan was a refinance of the prior commercial loan, and therefore, it is also a commercial loan.

_____

[6]The Interfirst loan decreased the interest rate from 9.9% to 7.875%.

Defendants rely on *Sherlock*, 2008 U.S. Dist. LEXIS 21794 and *Gambosi v. Carteret Mortgage Corp., et al.*, 894 F.Supp.181 (E.D. Pa. 1995) in support of the aforementioned arguments. Defendants assert that both *Sherlock* and *Gambosi* stand for the following propositions: If mortgage refinancing results in less favorable terms for the borrower, courts determine the purpose of the refinancing by the borrower's use of any excess proceeds. *Id*. If more than half of those excess proceeds are used for a business purpose, then the loan is a commercial debt. *Sherlock* at *4-8; *see also Gambosi*, 894 F.Supp at 181. On the other hand, if mortgage refinancing results in more favorable terms than the prior loan, the purpose of prior loan should be considered when determining the purpose of the latter loan. *Gambosi*, 894 F.Supp. at 181. Both purposes are relevant, but the "primary purpose" must be determined by the allocation of the majority of the loan funds. *See Sherlock*, 2007 U.S. Dist. LEXIS 21794, at *25.

In *Sherlock*, the plaintiffs refinanced an existing mortgage of $1.2 million on their personal residence and received a new mortgage in the amount of $1.7 million on the same property. *Id.* at *3-4. The *Sherlock* court held "courts faced with similar arrangements have been virtually unanimous in finding that the mere fact that the loan was secured by the family home does not itself bring the transaction under TILA." *Id.* It is the "purpose for which the credit was obtained – not the nature of the collateral used to get it" that controls whether a loan is for a consumer or commercial purpose. *Id.* at *12. Defendants do acknowledge that the use of some portion of the funds for some personal, family, or household purpose does not bring the debt within the parameters of the FDCPA. (Defs' Reply at 10). Defendants argue that Plaintiff's argument that the foreclosure action was only initiated on the $168,000 loan and the

second mortgage for $42,000 is irrelevant and "defies credulity." (Defs' Reply at 15).

Defendants assert that "Plaintiff could not obtain the $168,000 first mortgage without paying off

the existing $188,187.05 owed on the existing first mortgage from the December 2005 loan.

Therefore, both the first and second mortgage loans were needed to pay off the December 2005

loan, and both loans are interrelated and form the circumstances surrounding the transaction as a

whole.

### 3.     *Applicable FDCPA law*

The FDCPA defines a "debt" as an obligation "to pay money arising out of a transaction

in which the money, property, insurance, or services which are the subject of the transaction are

*primarily for personal, family, or household purposes*, whether or not such obligation has been

reduced to judgment." 15 U.S.C. 1692(a)(5) (emphasis added). Due to the small number of

cases interpreting "debt" under the FDCPA, some federal courts use the standards under the

Truth In Lending Act ("TILA") to determine whether a debt is primarily for personal, family, or

household purposes. *See e.g., Bloom v. I.C. System*, Inc., 972 F.2d 1067, 1068 (9th Cir. 1992).

Courts have unanimously found that a mortgage refinancing does not fall within the definition of

"debt" simply because the borrower's residence secures it. *Sherlock,* 2008 U.S. Dist. LEXIS

21794 at *12. Rather, the purpose for which the debt was incurred determines the nature of the

loan, rather than the collateral securing the debt. *See Sherlock*, 2008 U.S. Dist. LEXIS 21794, at

*12.

There are cases involving the TILA that look to the loan that the current loan is

refinancing, however, there is no absolute rule as Defendants suggest. In *Federal Land Bank of*

*Jackson v. Kennedy, et al.*, 662 F. Supp. 787 (N.D. Miss. 1987), Kennedy had obtained several

-13-

loans on his property with the latest in 1981 for $146,000. He used $77,647 to refinance existing indebtedness and the remaining $60,000 to pay his wife pursuant to a divorce action. The original loan to build the home that secured the mortgage was substantially paid off. The court held that the majority of the loan was used for agricultural purposes and therefore exempt from the TILA.

In *Cashmere Valley Bank v. Brender*, 128 Wn. App. 497 (Wa. App. 2005), aff'd 158 Wash.2d 655 (Wash. 2006), the Court found that the loan in question was a hybrid loan, made for both consumer and business purposes, and therefore applied the quantitative approach to determine whether it was primarily a consumer or commercial loan. Applying the quantitative approach, courts look to whether a majority of the loan proceeds were used for commercial purposes or consumer purposes. *See Bokros v. Assocs. Fin., Inc.*, 607 F. Supp. 869 (N.D. Ill. 1984); *Stillman v. First Nat'l Bank*, 117 Idaho 642 (1990). Applying this analysis to the facts, the court held that "more than one-half of the proceeds of the 1993 loan were used for business purposes and the 1993 loan was exempt from the TLA. . .. Because all the subsequent loans were simply renewals of the 1993 loan, these loans also would be exempt under this analysis." *Cashmere*, 128 Wn. App. at 504.

Another approach to determine the character of a hybrid loan is the original purpose analysis. *Id.*; *see also Toy Nat'l Bank v. McGarr*, 286 N.W.2d 376 (Iowa 1979). In *Toy*, the court examined several notes that were eventually consolidated and secured by a new second mortgage. The court analyzed step-by-step, each transaction separately, looking to the original purpose of each loan throughout the life of the loan. Ultimately the court concluded that the transaction in question was not for consumer purposes.

The final approach discussed by the court in *Cashmere* is the "all circumstances" analysis. *Cashmere,* 128 Wn. App. at 504-505; *see also Conrad v. Smith*, 42 Wn. App. 559, 562 (1986). In *Conrad*, the court approved an expanded inquiry, concluding that the determination regarding whether a loan is for personal or business purposes is a question of fact requiring consideration of all of the circumstances surrounding the transaction. The court went on to conclude that the facts were sufficiently established to resolve the issue as a matter of law. *Id.* at 563.

### 4. *Analysis of Plaintiff's FDCPA claim*

The loan that is the subject of this litigation is the March 2006 loan. Plaintiff refinanced the existing mortgage on her residence and reduced her interest rate from 9.9% to 7.875%. Therefore, the mortgage refinancing resulted in more favorable terms than the prior loan and according to Defendants, the purpose of the prior loan should be considered when determining the purpose of the latter loan. *See Gambosi*, 894 F.Supp. at 181.

Defendants therefore turn the focus to the December 2005 loan and its purpose. Defendants rely on *Gambosi* and *Sherlock* in support of their arguments, however, in both those cases, the plaintiffs refinanced their existing mortgage but did not improve the loan terms. Rather they needed to refinance to obtain additional cash to pay off other debts. Therefore, the courts in both those cases looked primarily to the how those proceeds were used after paying off the previous mortgage. But that is not the case here. Plaintiff refinanced in March 2006 and received a much more favorable interest rate on her residence.

Defendants argue that *Gambosi* stands for if mortgage refinancing results in more favorable terms than the prior loan, the purpose of prior loan should be considered when

determining the purpose of the latter loan, *Gambosi*, 894 F.Supp. at 181, however, no where in the case is this mentioned.  As discussed above, *Gambosi* involved a refinance for less favorable terms than the original loan.

Plaintiff argues, however, that the Court need not consider the purpose of the prior December 2005 loan, but only consider the purpose of the March 2006 loan.  First, Plaintiff argues that the Court in its October 20, 2008 Order explicitly restricted discovery and briefing to "whether the loan obtained by Ms. Graham in March, 2006, was for a commercial purpose or for personal, family, or household purposes."  (Doc. 26).   Second, Plaintiff argues that the underlying debt (the December 2005 refinance) is not relevant to whether a party has stated or proven a claim under the FDCPA because the question of FDCPA coverage focuses on the transaction from which arose the alleged obligation to pay at issue in the collection activity on which the FDCPA claim is based, the InterFirst loan.  *See Schroyer v. Frankel*, 197 F.3d 1170, 1178 (6th Cir. 1999) ("Additionally, we note that the FDCPA holds debt collectors liable for various 'abusive, deceptive, and unfair debt collection practices' regardless of whether the debt is valid."); *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992); *Azar v. Hayter*, 66 F.3d 342 (11th Cir. 1995) (holding that FDCPA claims have "nothing to do with whether the underlying debt is valid" and instead concern "the method of collecting the debt").

Finally, Plaintiff argues that an inconsistency arises when you look at proceeds for the purposes of TILA rather than debt for purposes of the FDCPA.  Plaintiff compares *Bokros v. Associated Finance, Inc.*, 607 F. Supp. 869 (N.D. Ill. 1984) with *Sherlock*.  *Bokros* did not examine a previous loan, but the loan proceeds in that case were determinative when more than half of the proceeds were used to purchase a tractor-trailer.

The Court recognizes Plaintiff's argument that there is a difference between the FDCPA and the TILA, and accordingly, the analysis in cases dealing with each law could generate discrepancies. However, at this time with little case law available under the FDCPA, courts have instructed that looking to TILA cases will help interpret debt questions under the FDCPA. *See Bloom*, 972 F.2d at 1068. Therefore, the Court will do the same.

The Court will begin with the March 2006 loan, which was the subject of the underlying foreclosure action. The second mortgage that was also obtained at the same time was not at issue in the foreclosure case, however, in considering the transaction as a whole, the second mortgage was necessary to obtain the first mortgage because the terms required satisfying the previous December 2005 mortgage. Therefore, the total Plaintiff borrowed was $210,000 ($168,000 on the first mortgage and $42,000 on the second). The balance of the December 2005 loan, $188,187.05, was paid off. Plaintiff used $11,483 to pay off her credit card and received an additional $2,837. Plaintiff would like the Court to only examine this loan and therefore the majority, $188,187.05 of the total $210,000 was used to pay off the previous mortgage on Plaintiff's personal residence therefore deeming the loan primarily for personal use. Even if the remaining $14,320 were all used for some commercial purpose that would not change the fact that the majority of the loan was used to satisfy the previous mortgage.

The Court is inclined to agree with Plaintiff, that the circumstances surrounding this loan are all that should be considered. *See Johnson v. Wells Fargo Home Mortgage, Inc.*, 2007 U.S. Dist. LEXIS 79989, at *24 (D. Nev. Oct. 29, 2007) (*quoting Bloom v. I.C. System, Inc*., 972 F.2d 1067, 1068 (9th Cir. 1992) ("When classifying a loan, courts typically examine the transaction as a whole, paying particular attention to the purpose for which the credit was extended in order to

determine whether [the] transaction was primarily consumer or commercial in nature."). There is concern with Defendants' analysis in how far the Court should reach back to examine the purpose of the loan. If the loan were traced back to its inception, it would clearly have a personal purpose as the first loan on this property was used to purchase the Island Court residence. The aforementioned cases do recognize that at times it is appropriate to look to the purpose of the prior loan that the current loan is refinancing, but it is definitely not an absolute rule as argued by Defendants.

Defendants urge the Court to adopt the aforementioned cases as the general rule, when a loan refinances a previous loan, courts look to the purpose of the previous loan to determine the purpose of the refinancing loan. But based on their analysis of *Gambosi* and *Sherlock*, Defendants also argue that there is an exception to the general rule, if the refinancing loan provides terms that are less favorable than the previous loan, then the court should look to the purpose and use of any cash-out proceeds from the refinancing to determine that loan's purpose. *Gambosi*, 894 F. Supp. At 181-182; *Sherlock*, 2008 U.S. Dist. LEXIS 21794.

Following Defendants suggested analysis, the Court would consider the purpose of Plaintiff's December 2005 loan, and only examine the cash-out proceeds from that loan regardless of how small a portion those proceeds are in comparison to the loan as a whole. Defendants urge that "as a matter of simple economics, and common sense, a person will not ordinarily take out a loan for the purpose of refinancing a prior loan if the new loan is on less favorable terms than the existing loan. If a person decides to refinance on less favorable terms her or she must have some other purpose for the loan – e.g., to obtain the proceeds of the loan in excess of the payoff amount." (Defs' Reply at 11).

The court in *Gambosi* found that "the primary purpose of the loan in question was to acquire the remaining proceeds after the satisfaction of all the conditions of obtaining the loan." Therefore, the court held that "the disposition of those remaining proceeds must **weigh heavily** in determining the primary purpose of the Carteret loan." *Gambosi*, 894 F. Supp. at 181 (emphasis added). Again, based on *Gambosi*, the Defendants argue this is an absolute rule, but the Court merely must weigh the purpose of those remaining proceeds more heavily. In *Gambosi*, the court did just that. The total loan, minus the closing costs and fees was $235,182.65. Of that amount, $124,884.10 was used to satisfy the residential mortgage and outstanding taxes. Of the $110,298.55 remaining loan proceeds, $65,015.50 paid off a business loan and the remaining approximately $45,000 went to the Gambosis in which the court determined must of that total paid off other business debts. Applying any of the aforementioned tests to this set of facts, such as the quantitative approach, the outcome would be very close. Slightly more than half of the proceeds of the loan were used for a consumer purpose and the remainder was for a commercial purpose. The *Gambosi* court does not discuss the tests as set forth in *Cashmere*, but appears to instruct that after doing such analysis, the purpose of the cash-out proceeds, the $110,298.55, should weigh more heavily.

Considering many of the cases interpreting this issue and the aforementioned tests, the Court finds that none of the cases have dealt with a similar situation to the case at bar. None of the aforementioned cases involves a similar complex set of facts like the ones before this Court. None involve multiple refinances on a personal residence where the latest refinance involved a more favorable interest rate, but the prior refinance was for a less favorable interest rate, and where the cash-out proceeds were such a small portion of the total loan amount.

Applying a combination of the aforementioned tests to the case at bar, the Court finds that the December 2005 refinance was for a consumer purpose, and therefore, the refinance of that loan in March 2006 was also for a consumer purpose. The December 2005 loan was for a total of $186,200. $168,250 of the total amount was used to satisfy the prior loan from August 2005. Plaintiff received $10,337.68 after deduction of closing costs and taxes. Defendants want the Court to only consider the purpose of the $10,337.68 to determine the purpose of the entire loan. The majority of the $10,337.68 was used to purchase two investment properties and therefore that portion of the loan would be characterized as commercial. The test, as illustrated above, however, is not to consider *ONLY* the cash-out proceeds as Defendants would like, but rather to *WEIGH HEAVILY* those cash-out proceeds in determining the ultimate purpose of the loan. The case at bar is very different from *Gambosi* in that only a small portion of the total loan was used for commercial purposes. So, even giving greater weight to the cash-out proceeds, it does not even come close to the majority of the total loan being for commercial purposes. The Court finds that the December 2005 loan was primarily for personal, family, or household purposes, and accordingly, the March 2006 loans, which refinanced the December 2005 loan, constitute a "debt" and are subject to the FDCPA.

# IV. CONCLUSION

Based on the aforementioned, Defendants' Motion for Judgment on the Pleadings is

**DENIED**.

At the time of filing their Motion for Judgment on the Pleadings, Defendants also filed a

Motion to Strike Class Allegations (Doc. 16). Pursuant to Magistrate Judge Kemp's October 20,

2008 Order, all issues other than the subject matter jurisdiction issue, were to be deferred until

the Court determines if subject matter jurisdiction exists in this case. Having determined that the

Court has subject matter jurisdiction over this case, the parties shall contact Magistrate Judge

Kemp's chambers to schedule a status conference to discuss scheduling matters, including

briefing on the Motion to Strike Class Allegations. At this time, Defendants' Motion to Strike

Class Allegations (Doc. 16) has not been fully briefed and not ripe before the Court. Therefore,

it will be dismissed as untimely subject to being reinstated once the issue has been fully briefed.

The Clerk shall remove Documents 15 and 16 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**